$C4$

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TYRONE G. RIDGEWAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 07 C 3246 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Arlander Keys |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tyrone G. Ridgeway moves this Court for summary

judgment pursuant to Rule 56(a) of the Federal Rules of Civil

Procedure, to reverse and remand for an award of benefits, the

final decision of the Commissioner of the Social Security

Administration (Commissioner), who denied his claim for

Supplemental Security Income (SSI). *See* 42 U.S.C. § 405(g),

1383(c)(3) (West 2008). In the alternative, Plaintiff seeks an

order reversing and remanding the case to the Commissioner for

additional proceedings. Defendant moves to affirm the decision

of the ALJ that Plaintiff is not disabled. For the reasons set

forth below, the Court grants Plaintiff's Motion for Summary

Judgment, in part, and remands the matter back to the

Commissioner for further proceedings consistent with this

Opinion.

## Procedural History

On September 21, 2005, Plaintiff filed an application for SSI, alleging that seizures; schizophrenia; and a dislocated shoulder rendered him disabled. (R. at 17.) His claim was denied on February 28, 2006. (R. at 25.) On March 1, 2006, Mr. Ridgeway filed a Request for Reconsideration, which was denied on May 19, 2006. (R. at 32.)

On June 15, 2006, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. at 37.) A hearing was held on November 21, 2006, before ALJ Paul R. Armstrong. (R. at 17.) Following the hearing, the ALJ issued an unfavorable decision, finding Plaintiff not disabled at any time through January 23, 2007, the date of the ALJ's decision. (R. at 14-24.) Plaintiff filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council (Appeals Council). (R. at 3.) The Appeals Council denied the request on May 8, 2007. (*Id.*) Consequently, the ALJ's decision stands as the final administrative determination of the Commissioner. (*Id.*)

## Factual History

### 1.    Plaintiff's Testimony

At the hearing, Plaintiff testified that he possesses a General Equivalency Diploma (GED), having obtained it while incarcerated. (R. at 363.) He indicated that he lives with his sister. (R. at 361.) For more than 16 years prior to living

2

with his sister, Mr. Ridgeway had been in prison. (R. at 370.) Though he has a history of alcohol abuse, Plaintiff testified that he has not had a drink since 2005. (R. at 363.) While Mr. Ridgeway has no significant work experience outside of the correctional system, while in prison he held jobs in the laundry room, the kitchen, and the mattress factory. (R. at 367-68.)

When discussing his physical limitations and impairments, Mr. Ridgeway testified that he experiences epileptic seizures two to three times per month despite taking 300 mg of Dilantin, an anti-epileptic medication. (R. at 359-60.) Plaintiff further stated that the resulting loss of consciousness and physical shock necessitates a recovery period of three to four days after a seizure. (R. at 356.) Mr. Ridgeway's last seizure occurred, he stated, in October 2006. (*Id.*)

In addition to said seizures, Mr. Ridgeway indicated that as a result of a surgical procedure, he has difficulty utilizing his right arm as it is perpetually numb and locks after a period of use - as do the fingers on his right hand. (R. at 361-62, 370.) Aside from these complications, Mr. Ridgeway asserted that he suffers from double vision in his left eye and is unable to see out of his right; he oftentimes relies on a magnifying glass to see. (R. at 363-64.)

Plaintiff testified that approximately once every six months, he hears a male voice telling him to commit suicide by

3

overdosing on pills. (R. at 364.) However, upon questioning by the ALJ, Plaintiff denied an allegation that he attempted suicide while in prison by taking an overdose of Dilantin. (R. at 365-66.)

Mr. Ridgeway also suffers from a sleep disorder which prevents him from resting at night. (R. at 378.) As a result, he testified that he naps from three to five times each day, with each nap lasting approximately 45 minutes. (*Id.*)

According to Plaintiff, during his incarceration, he had difficulties maintaining working relationships with other inmates. (R. at 368-69.) He testified that he was able to maintain his job as a laundry dryer because he was not "bothered." (*Id.*) But when working in the kitchen and in the mattress factory, he would get into arguments with his co-workers and subsequently placed in segregation. (*Id.*) Mr. Ridgeway stated that this aversion towards people continued after his release from prison and, as a result, he has no friends and spends his days alone at home listening to the radio, watching television, or reading. (R. at 372.)

Mr. Ridgeway also indicated that he has difficulties remembering things told to him. (R. at 382.) To be sure, he testified that it was necessary that his aunt write down detailed directions so that he could travel to the hearing before the ALJ. (*Id.*) Further, Plaintiff testified that he would have been

4

unable to obtain the directions on his own because he suffers
from a short attention span. (*Id.*) This short attention span,
Plaintiff testified, even precludes him from drawing his own bath
water. (R. at 384.)

Though Mr. Ridgeway has sought employment since being
released from prison, he testified that he has been unsuccessful
in his attempt. (R. at 382-83.)

## 2. Vocational Expert's Testimony

Ms. Julie Bose, a vocational expert (VE), testified at
Plaintiff's hearing. (R. at 385-87.) The ALJ described to Ms.
Bowes a person with no past relevant work experience. (R. at
385.) The hypothetical person, the ALJ said, was "limited to
light exertional abilities, frequent reaching with the right non-
dominant arm, no restrictions on the left, simple, unskilled
work." (R. at 386.) The ALJ asked the VE to further assume that
the person would be limited to "no more than superficial contact
with supervisors, co-employees and the general public." (*Id.*)
Ms. Bowes concluded that the hypothetical person could perform
three different jobs. (*Id.*) First, he could perform work as a
bathroom attendant, of which there are approximately 800 to 1,000
positions in the Chicago metropolitan area. (*Id.*) Second, the
hypothetical person could perform work as a laundry folder, of
which there are approximately 2,200 to 2,400 positions in the
Chicago metropolitan area. (*Id.*) Finally, he could perform work

5

as a collator operator, of which there are approximately 4,400 to 4,600 positions available in the Chicago metropolitan area. (*Id.*)

The ALJ then questioned whether that same hypothetical individual would be precluded from holding one of the three aforementioned jobs if the individual was unable to "deal at all with supervisors, co-employees and the general public." (*Id.*) Ms. Bowes testified that the individual would be unable to hold any of the three jobs. (*Id.*) When questioned by the ALJ as to whether the same individual, capable of dealing with people superficially but requiring an unscheduled nap at least once a day for an hour or 45 minutes, would be unable to hold one of the suggested jobs, the VE responded in the affirmative. (*Id.*)

## 3. **Medical Evidence**

Plaintiff submitted medical records to the ALJ detailing his treatment. The Court will discuss these records in full.

### A. *Correctional Facilities*

On October 1, 2001, a psychologist prepared a mental health evaluation of Mr. Ridgeway. (R. at 186.) The report indicated that his mood was appropriate and his affect was within normal limits. (*Id.*) Further, the psychologist indicated that there was no evidence of major depression. (*Id.*) At that time, Plaintiff was stable and presented no evidence of distress. (*Id.*) Subsequent mental health evaluations – dated January 23,

2002 and March 7, 2002 – listed Mr. Ridgeway's diagnosis as, *inter alia*, anti-social personality disorder. (R. at 187, 188)

A memo issued by the Illinois Department of Corrections, dated April 18, 2003, indicates that, as a result of Mr. Ridgeway's medical condition, he was to be issued a low bunk. (R. at 100.)

On February 5, 2004, a mental health professional at Lawrence Correctional Center diagnosed Mr. Ridgeway as having narcissistic personality disorder and anti-social personality disorder. (R. at 203.) Though Plaintiff was alert, oriented, and his mood normal, the mental health professional listed Mr. Ridgeway's judgment, insight, and impulse control as poor. (*Id.*)

An Offender History form completed December 23, 2006, by a representative at the Illinois Department of Corrections notes Plaintiff's right shoulder injury, seizures, and Dilantin medication dosage. (R. at 317.)

An Illinois Department of Corrections mental health evaluation of Mr. Ridgeway dated December 27, 2005, indicates that he had taken medication for mental health and/or emotional issues and that he had attempted to overdose in the past. (R. at 324.) Additionally, Mr. Ridgeway's dosage of Haldol, an anti-psychotic medication, is noted on a health status transfer form dated January 8, 2006, and provided by the Department of Corrections. (R. at 320.)

Treatment notes dated January 10, 2006, indicate that Plaintiff was taking Haldol and had been diagnosed with schizophrenia. (R. at 325.) Further, Offender Outpatient Progress Notes regarding Plaintiff, dated January 25, 2006, reveal that Mr. Ridgeway suffers seizures three times annually and noted his diagnosis as seizure disorder. (R. at 322.)

## B. *John H. Stroger, Jr. Hospital*

Plaintiff visited the emergency room (ER) of the John H. Stroger, Jr. Hospital (Stroger) five times.

On September 14, 2005, Plaintiff visited the ER seeking refills of Dilantin. (R. at 163.) During this hospital visit, Plaintiff indicated that he was currently taking Haldol and Dilantin and that his last seizure occurred a year earlier. (*Id.*) The report indicates that Mr. Ridgeway had a history of seizures. (*Id.*) In addition to providing Mr. Ridgeway with a prescription, the treating physician noted seizure disorder and depression as Plaintiff's discharge diagnoses. (R. at 162.)

On September 28, 2005, Mr. Ridgeway again visited the ER. On this occasion, he indicated that he suffered a seizure during the previous night. (R. at 153.) Plaintiff informed the ER staff that he was currently taking Dilantin and Prozac and that his last seizure occurred 3 years prior. (*Id.*) The physician's report reveals that Mr. Ridgeway has a history of epilepsy and that at the time of the hospital visit, Plaintiff was compliant

8

with his Dilantin. (*Id.*) The ER doctor listed Plaintiff's discharge diagnoses as seizure and visual changes. (R. at 153, 159.) Subsequently, Plaintiff was given a prescription for Dilantin and discharged. (R. at 159.)

Plaintiff returned to Stroger on October 29, 2005, and reported that his last seizure occurred on September 27, 2005. (R. at 281.) Mr. Ridgeway informed the ER physician that he does not suffer seizures if he takes his medication as prescribed. (R. at 279.) The doctor noted a history of seizures and gave Plaintiff a prescription for Dilantin and advised him to take his medications regularly. (R. at 280-81.)

Mr. Ridgeway again visited Stroger on November 3, 2005, requesting medication refills. (R. at 282.) During this visit, he indicated that his last seizure occurred on October 28, 2005. (R. at 284.) Mr. Ridgeway further indicated to the ER physician that he experiences a seizure every six months. (R. at 282.) After noting a discharge diagnosis of seizure disorder, the doctor provided Plaintiff with a prescription for Dilantin and advised him to return as needed. (R. at 282-83.)

On December 9, 2005, Plaintiff returned to Stroger seeking refills of Dilantin. (R. at 285.) He indicated that he experienced his last seizure two days earlier. (R. at 287.)

## C. *Mount Sinai Hospital*

Mr. Ridgeway visited Mount Sinai Hospital's ER on December

9

8, 2005, for a seizure evaluation. (R. at 298.) The ER
personnel found Plaintiff to be non-compliant with his Dilantin
medication - his level was 8.1 $\mu$g/mL (normal range, 10.0 - 20.0
$\mu$g/mL). (R. at 298, 304.) Mr. Ridgeway informed the treating
physician that he suffered a seizure and that he had not taken
his medication for 3-4 days because he had none and was unable to
get more. (R. at 299.) He was given Dilantin and advised to
take his medication as prescribed. (R. at 303.)

### D.  Dr. Harley Rubens

On November 7, 2005, Dr. Rubens performed a psychiatric
evaluation on Plaintiff. (R. at 255.) During the evaluation,
Mr. Ridgeway indicated that, while at Hill Correctional Center,
he was told that he has manic depression and schizophrenia.
(Id.) He informed Dr. Rubens that his seizures began when he was
18 years of age. (Id.) Dr. Rubens' report reveals that
Plaintiff's sleep is "marked by restlessness." (R. at 256.)
During the visit, Plaintiff's disposition was highly guarded and
mood mildly anxious. (Id.) Further, the physician noted that
Mr. Ridgeway's recent memory was good - having recalled the route
to the office - as well as both his remote and immediate memory.
(Id.) Dr. Rubens listed Plaintiff's diagnoses as including
antisocial personality disorder and right shoulder problem and
seizures by history. (Id.) Mr. Ridgeway told Dr. Rubens that he
had taken many pills while in prison and was subsequently placed

10

in a naked cell. (*Id.*)

### E. Dr. Anand Lal

On April 19, 2006, Dr. Anand Lal performed a physical examination on Plaintiff. (R. at 307.) Dr. Lal indicated that Plaintiff complained of seizure disorder, slight right hand weakness, left eye double vision and eye infection, sleeping disorder and hearing voices. (*Id.*) At the time of the visit, Plaintiff indicated that his last seizure occurred two months prior and that he averages approximately four seizures a year. (*Id.*) He further stated that the occurrence of his seizures depend on his taking medication; if he fails to take his medication as prescribed, he experiences seizures more often. (*Id.*) Plaintiff indicated that his right hand weakness resulted from a previous surgery. (*Id.*) Mr. Ridgeway discussed his difficulty sleeping and the voices that he hears telling him to commit suicide. (R. at 308.) However, he indicated that his medication helped with both the voices and the restlessness. (*Id.*) At the time of Plaintiff's visit, he was taking Benztropine, Haldol, and Dilantin. (*Id.*)

Dr. Lal's report reveals that Mr. Ridgeway's right hand tested at a 4 grade on a scale of 5 and no atropy of the arm or forearm was present. (R. at 309.) Dr. Lal further noted that, since Plaintiff is left-handed, Plaintiff would have no problem using his left hand in performing tasks. (*Id.*) In addition, Dr.

11

Lal found Mr. Ridgeway to possess normal memory and affect. (R. at 310.) The doctor made the following diagnoses: grand mal seizure disorder, history of schizophrenia, history of double vision of the left eye, and minimal residual weakness of the right hand. (*Id.*)

## *F.* *Dr. George Andrews*

The non-examining State Agency physician, Dr. George Andrews, completed a physical residual functional capacity assessment (RFC) on May 17, 2006. (R. at 331.) Dr. Andrews noted that Mr. Ridgeway could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for a total of at least 2 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and found Plaintiff's ability to push and/or pull unlimited, other than the aforementioned limitations. (*Id.*) Dr. Andrews noted that Plaintiff had a history of seizures and was non-compliant with his medication. (*Id.*) Because Mr. Ridgeway had a residual 4/5 weakness in the right upper extremity, the doctor advised that Plaintiff avoid heavy lifting. (*Id.*) Dr. Andrews opined that Mr. Ridgeway could frequently engage in activities requiring climbing a ramp/stairs, balancing, stooping, kneeling, crouching, and crawling. (*Id.* at 332.) However, Dr. Andrews suggested that Mr. Ridgeway never climb a ladder/rope/scaffolds; he further advised that Plaintiff avoid "unprotected heights due to seizure

disorder." (*Id.*) Dr. Andrews stated that Plaintiff possesses no manipulative, visual, or communicative limitations. (R. at 333-34.) With respect to environmental limitations, Dr. Andrews cautioned Mr. Ridgeway to avoid concentrated exposure to hazards — specifically advising Plaintiff to "avoid hazardous situations due to the possibility of seizure."

## G. Dr. Adedapo Williams

On July 25, 2006, Dr. Adedapo Williams diagnosed Mr. Ridgeway as suffering from a major depressive disorder with psychiatric symptoms. (R. at 340.) Dr. Williams' notes indicate that he first saw Plaintiff on April 12, 2006. (*Id.*) Dr. Williams assigned Plaintiff a global assessment of functioning value (GAF) of 45 and indicated that Plaintiff suffers from either intermittent or persistent delusions or hallucinations. (*Id.*) Dr. Williams further noted that Mr. Ridgeway had moderate restriction of activities and moderate difficulty in maintaining social functioning. (*Id.*) The report of Dr. Williams reveals that Plaintiff was deficient in concentration, persistence or pace which resulted in his frequent failure to complete tasks in a timely manner. (*Id.*) Further, Dr. Williams noted that Mr. Ridgeway had repeated episodes of deterioration or decompensation in work or work-like settings, causing him to withdraw from the situation or to experience exacerbation of signs and symptoms. (*Id.*) Plaintiff, Dr. Williams opined, has a documented history

of two or more years of inability to function outside of a highly
supportive living situation. (*Id.*) Additionally, it was Dr.
Williams' view that Plaintiff was markedly impaired in all work
limitations related to psychiatric state. (R. at 341.)

### H. Dr. Brannegan

On August 3, 2006, Dr. Brannegan completed an RFC
questionnaire regarding Mr. Ridgeway. (R. at 348.) Having first
seen Plaintiff on March 31, 2006, Dr. Brannegan opined that
Plaintiff suffers from epilepsy. (R. at 345.) Further, Dr.
Brannegan noted that Mr. Ridgeway suffers from generalized
seizures during which he loses consciousness. (*Id.*) These
seizures, Dr. Brannegan asserted, typically last five minutes and
generally occur during Plaintiff's sleep. (R. at 345-46.)
Despite finding Mr. Ridgeway compliant with Dilantin, Dr.
Brannegan opined that Plaintiff's seizures are likely to disrupt
the work of coworkers. (R. at 346-47.) The doctor further noted
that Plaintiff requires more supervision at work than an
unimpaired worker. (R. at 347.) It was recommended that Mr.
Ridgeway not work at heights, not work with power machines which
require an alert operator, nor operate a motor vehicle. (*Id.*)
Dr. Brannegan indicated that Plaintiff suffered from depression,
and that while Plaintiff's impairments would not produce "good
days" and "bad days," Plaintiff would sometimes need to take
unscheduled breaks during an 8-hour work day. (R. at 348.)

14

## I. *Lab Reports*

A report prepared by LabCorp, dated July 10, 2004, indicates
that Plaintiff's Dilantin level was 7.6 μg/mL, with the normal
range being 10.0 - 20.0 μg/mL. (R. at 171.) Another report by
LabCorp, dated November 16, 2004, also indicates that his
Dilantin level was low – specifically, 7.7 μg/mL. (R. at 173.)
However, on March 2, 2005, Mr. Ridgeway's Dilantin level was 12.1
μg/mL – within range. (R. at 177.) On July 1, 2005, a report
from Hillsboro Area Hospital reveals that once again, his
Dilantin level was low, 5.0 μg/mL. (R. at 178.) Plaintiff's
Dilantin level exceeded the range on June 28, 2005, as revealed
in a report prepared by LabCorp, indicating that the level was
24.8 μg/mL. (R. at 181.) The level remained high, 20.2 μg/mL,
on August 3, 2005. (R. at 182.)

## 4. **The ALJ's Decision**

On January 23, 2007, the ALJ, applying the five-step
analysis, 20 C.F.R. Part 404, 1520(a)(f), found at step 1 that
Mr. Ridgeway had not engaged in substantial gainful activity.
(R. at 19.) At step 2, the ALJ found that Mr. Ridgeway suffered
from severe impairments, including personality disorder; right
shoulder injury; and history of polysubstance abuse. (*Id.*)
However, the ALJ then found at step 3 that none of Mr. Ridgeway's
impairments – alone or in combination – met or medically equaled
any of the impairments listed in 20 C.F.R., Part 404, Subpart P,

Appendix 1, including sections 1.02, 12.08, and 12.09. (R. at 21.)

In assessing Plaintiff's RFC, the ALJ determined that Plaintiff retained the "capacity for light work exertionally, no constant but frequent reaching with right (dominant) hand, and simple, unskilled work." (R. at 22.) In explaining his finding, he noted that the "medically determinable impairments could reasonably be expected to produce the alleged symptoms [Mr. Ridgeway complained of], but that [his] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (Id.) The ALJ noted the significant periods of time, following the alleged onset of Plaintiff's symptoms, during which Plaintiff failed to take any medication for the symptoms. (Id.) Further, the ALJ expressed concern with the fact that Mr. Ridgeway never worked and questioned whether Plaintiff's unemployment was really the result of medical problems. (Id.) Finding that the opinion of Dr. Williams was not supported by the medical record, the ALJ gave "little weight" to the RFC questionnaire completed by Dr. Williams, which indicated that Plaintiff was markedly impaired in all work related mental activities. (Id.) The ALJ found that Plaintiff did not lack the ability to meet the basic mental demands of "competitive, remunerative, and unskilled work," including the ability to "understand, carry out, and remember simple

16

instructions, to respond appropriately to supervision, coworker, and usual work situations, and to deal with changes in a routine work setting." (*Id.*) Further, the ALJ found little merit in Dr. Brannegan's opinion which restricted the types of employment that Plaintiff could perform, having found this opinion to be unsupported by the medical facts and findings contained in the record. (*Id.*) Additionally, the ALJ was not persuaded by Dr. Andrews' opinion limiting the types of jobs that Plaintiff could hold. (*Id.*)

At step 4, the ALJ found that Mr. Ridgeway has no relevant past work experience. (*Id.*) Finally, at step 5, the judge considered Plaintiff's age; education; work experience; and RFC to conclude that there exist jobs in significant numbers in the national economy that Mr. Ridgeway can perform. (*Id.*) Therefore, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act. (*Id.*)

## Standard of Review

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 409 (1971).

17

In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

While an ALJ need not address every piece of evidence in the record, he must articulate his analysis by building an "accurate and logical bridge from the evidence to [his] conclusion" so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated so as to prevent meaningful review, the Court must remand. *Sims v. Barnhart*, 309 F.3d 424, 429 (2002).

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for SSI must prove that he has a disability under the terms of the Social Security Administration (SSA). In determining whether an individual is

18

eligible for benefits, the social security regulations require a
sequential five step analysis. First, the ALJ must determine if
the claimant is currently employed; second, a determination must
be made as to whether the claimant has a severe impairment;
third, the ALJ must determine if the impairment meets or equals
one of the impairments listed by the Commissioner in 20 C.F.R.
Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine
the claimant's RFC and must evaluate whether the claimant can
perform his past relevant work; and fifth, the ALJ must decide
whether the claimant is capable of performing work in the
national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.
1995). At steps one through four, the claimant bears the burden
of proof; at step five, the burden shifts to the Commissioner.
(*Id.*)

## DISCUSSION

Plaintiff contends that the ALJ erred in concluding that he
is not disabled. Plaintiff argues that the ALJ's decision should
either be reversed and remanded for an award of benefits or, in
the alternative, reversed and remanded for additional proceedings
by the ALJ.

## A. Step 3 Determination

Mr. Ridgeway argues that the ALJ erred in his step three
determination because, though the ALJ considered the B criteria,
he failed to discuss whether Plaintiff meets the C criteria for

19

Listing 12.04. 20 C.F.R., Part 404, Subpart P, Appendix 1, Rule 12.04. Plaintiff asserts that the ALJ was required to consider 12.04(c) because Plaintiff was diagnosed by his treating physician, Dr. Adedapo Williams, with a major depressive disorder.

Listing 12.04 applies to affective disorders. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04. The diagnostic definition of this provision indicates that affective disorders are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." (*Id.*) Mood is further defined as a "prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." (*Id.*) An individual possesses the required level of severity for this listing if either the A and B listing criteria are both satisfied or when the requirements in C are met. (*Id.*) Subpart (c) of Listing 12.04, the criteria upon which Plaintiff relies, requires:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement,

20

with an indication of continued need for such an
arrangement.

The Seventh Circuit requires an ALJ to build an "accurate
and logical bridge from the evidence to [his] conclusion" in
order that a reviewing court assess the validity of the court's
ultimate finding. *See Steele*, 290 F.3d at 941. Consequently,
the Seventh Circuit has ordered remand in cases where the ALJ
failed to cite a listing and otherwise provided a "perfunctory
analysis." *E.g.*, *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th
Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, (7th Cir. 2002).

Though the ALJ considered the B criteria, the Court finds
that he failed to consider whether Plaintiff meets or equals the
12.04(c) criteria. The ALJ never specifically mentioned Listing
12.04 and, while the ALJ acknowledged that Dr. Williams diagnosed
Mr. Ridgeway with "major depressive disorder with psychotic
symptoms," he failed to provide any discussion as to the impact -
if any - of this diagnosis on his analysis of Plaintiff's
impairments. Because this evidence could have led the ALJ to
conclude that Plaintiff's impairment met or equaled Listing 12.04
but was not discussed, the Court's attempt to assess the ALJ's
decision and provide Mr. Ridgeway meaningful review is frustrated
and ordinarily, remand to the ALJ would be appropriate. However,
the Commissioner is correct in noting that the ALJ's failure to
consider subpart C of Listing 12.04 is harmless error. A
requirement of Listing 12.04(c) is that there exist a medical

21

history of "chronic affective disorder of at least 2 years' duration." 20 C.F.R. Part 404, Subpart P, Appendix 1. While the Commissioner asserts that the first record of Mr. Ridgeway's diagnosis of depression came in July 2006, Plaintiff directed the Court's attention to evidence in the record which showed that Plaintiff was indeed diagnosed with depression in August 2005. However, even considering the date of the earlier diagnosis, Plaintiff's medical history of depression falls short of the two year requirement. Consequently, the Court rejects Plaintiff's contention that the error requires remand. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.")

## B.  Medical Opinions

Mr. Ridgeway asserts that the ALJ's failure to indicate exactly which inconsistencies exist between the treating physicians' opinions and the medical record require that the ALJ's decision be remanded.

The Seventh Circuit has held that the ALJ must give substantial weight to the medical evidence and opinions contained in the record, unless "specific, legitimate reasons constituting good cause are shown for rejecting it." *Knight*, 55 F.3d at 314.

Here, the ALJ discounted Dr. Brannegan's assessment of Mr.

Ridgeway's limitations regarding work with heights and power machines; operation of motor vehicles; and need for unscheduled work breaks. Without providing any detailed reasons, the ALJ found the opinion not supported by the medical record despite the fact that the record is replete with references to Plaintiff's seizure disorder. Additionally, the record shows that, not only is Dr. Brannegan of the opinion that Mr. Ridgeway should avoid heights due to his seizure disorder, but this view is shared by another physician, Dr. Andrews. The ALJ further gave "little weight" to Dr. Williams' opinions contained in Plaintiff's "Seizures RFC Questionnaire," which indicated markedly impaired limitations in all work-related mental activities. Though the ALJ found the opinions to be inconsistent with the medical record, he once again failed to discuss the perceived inconsistences, relying instead on his bald assertions that,

I note that the basic mental demands of competitive, remunerative, and unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions, to respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting. I find that the claimant does not have a substantial loss of any ability to meet any of these basic work-related activities.

(R. at 22.)

Again, when discussing Dr. Andrews' opinion that Mr. Ridgeway should be limited to medium work which does not include climbing ladders, ropes, or scaffolds, and no concentrated exposure to

23

hazards, the ALJ found the opinion inconsistent with the record — but failed to discuss those inconsistencies. The Court expresses no opinion as to the correctness of the ALJ's decision — only that the ALJ has failed to provide the Court with a sufficient basis by which to sustain his determination. Consequently, remand on these issues is proper.

## C.   RFC Assessment

Because the ALJ constructed a middle ground in formulating his RFC Assessment, Plaintiff argues that the RFC should be remanded.

The ALJ held that Plaintiff was mildly restricted in his activities of daily living. This was in contrast to the opinion of Dr. Williams, who found Mr. Ridgeway to be moderately restricted in these activities. The ALJ based his opinion on his assertion that there is no evidence in the record to establish inability to perform daily activities. The Court disagrees. Plaintiff has asserted on numerous occasions that, as a result of his inability to sleep at night, he requires naps throughout the day. The ALJ even described said limitation to the VE, who responded that this limitation would preclude an individual from holding any employment. "An ALJ may not ignore evidence that is contrary to [his] ultimate conclusion, [his] decision must be based on all the evidence." *Cuevas v. Barnhart*, 2004 U.S. Dist. LEXIS 13238, No. 02 C 4336 at *42 (N.D. Ill. July 14, 2004).

"[T]his is especially true when [he] solicits the testimony and opinions of a VE and then disregards this testimony without any explanation." *Sayles v. Barnhart*, 2001 U.S. Dist LEXIS 20398, No. 00 C 7200 at *17 (N.D. Ill. July 12, 2002). Because there exists in the record, contrary evidence which the ALJ used in soliciting the VE's opinion regarding the limitation, the Court holds that the ALJ must consider it. The Court also finds that the ALJ failed to adequately justify finding that Mr. Ridgeway has moderate difficulties in maintaining social functioning - based upon his inability to be around others – yet failed to account for this limitation in his RFC Assessment. Similarly, the ALJ found that Plaintiff is moderately restricted in maintaining concentration, persistence, or pace, yet failed to include any limitations in his RFC. Therefore, remand is the appropriate course of action.

However, the Court disagrees with Plaintiff's contention that the ALJ's finding that Mr. Ridgeway could engage in "light work," which by statute "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday," is inconsistent with Dr. Andrews' opinion that Mr. Ridgeway could stand and/or walk for a total of *at least* 2 hours in an 8-hour workday. Dr. Andrews did not *limit* Mr. Ridgeway to standing for two hours, rather, he indicated that two hours was the *least* amount of time that Plaintiff could stand. Consequently, this is

completely consistent with the ALJ's finding that Plaintiff could perform light work.

## D. The ALJ's Credibility Determination

Plaintiff contends that the ALJ's failure to consider the factors set forth in SSR 96-7p prior to issuing a credibility determination render the ALJ's credibility determination deficient.

SSR 96-7p states, in part:

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The ALJ found Mr. Ridgeway's complaints not entirely credible because, *inter alia*, "there have been significant periods of time since the alleged onset date during which the claimant has not taken any medications for those symptoms" and because "the claimant has never worked, which raises some questions as to whether the current unemployment is truly the result of medical problems."

Generally, an ALJ's credibility determination will be overturned only if the claimant can show that the determination

26

was "patently wrong." *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). The Court finds that Plaintiff failed to meet this burden. In the case at bar, the ALJ based his determination, in part, on Mr. Ridgeway's failure to take his prescribed medication. This finding is indeed supported by the record. To be sure, when Mr. Ridgeway visited Mount Sinai Hospital on December 8, 2005, the hospital personnel found that he was not compliant with his Dilantin. (R. at 298.) This was also the case when Dr. Andrews examined Plaintiff on May 17, 2006. (R. at 331.) Further, Plaintiff's own statements indicate that he was not always compliant since Plaintiff himself indicated to Dr. Lal that he experiences seizures more often when he fails to take his anti-epileptic medication. (R. at 307.) Additionally, the record contains lab reports showing Plaintiff to be noncompliant with his medication. (R. at 171, 173, 178.) As such, it is entirely reasonable for the ALJ to have relied on this evidence, contained in the record, to support his credibility determination. Consequently, the Court does not find that the ALJ's determination was patently wrong. Therefore, remand is not necessary with regard to this issue.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiff's Motion for Summary Judgment, in part, remanding the matter back to the Commissioner for further action consistent with this Opinion.

Date: September 23, 2008     E N T E R E D:

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT